[No. 22680. Department One. December 15, 1930.]

CHARLOTTE SWITZER, *by Her Guardian ad Litem Fred Switzer, Respondent,* v. THE CITY OF SEATTLE, *Appellant.*[1]

[1]Reported in 294 Pac. 225.

*A. C. Van Soelen* and *Walter L. Baumgartner* (*Thomas N. Swale,* of counsel), for appellant.

*Stanley J. Padden* and *John J. Sullivan,* for respondent.

HOLCOMB, J.—This action brought by respondent, a minor, by her guardian ad litem, grew out of injuries received by her in being struck by a street car operated by the city, which owns and operates a municipal railway system in Seattle. This appeal is from a substantial verdict and judgment thereon after motions for judgment n. o. v. or, in the alternative, for a new trial, had been denied in the second trial of the cause. The first trial resulted in a mistrial because of the disagreement of the jury.

As a part of the municipal street railway system of Seattle, it maintains a double-track street railway on Westlake avenue, which, in that locality, is called a north and south street. The portion of the street railway tracks in the vicinity where this accident happened skirts the westerly shore of Lake Union, and is not paved or open for other vehicular traffic except at certain places where cross-overs have been provided. To the west of the railway tracks, the avenue is paved in two twenty-foot strips between which lies a six-foot graveled parking space. The east roadway is used by north-bound vehicular traffic, and the west roadway by south-bound traffic. At a point on Westlake avenue where Wheeler street enters it from the west, the city has constructed and maintains a platform for the use of its street-car patrons and walks used as cross-overs by persons desiring to go beyond the city's tracks to the lake shore.

The south-bound, or cars going toward the business center of the city, use the westerly track and the north-bound cars, the easterly track. At the place in ques-

tion, these tracks are separated from the paved roadway by a concrete curb laid parallel to and about six feet from the westerly rail of the westerly track. This curb is raised about ten or eleven inches above the pavement. The street car tracks in this vicinity, being unpaved and uncovered, are not used either by vehicles or pedestrians except where cross-overs have been provided. The Wheeler street platform is constructed at the easterly edge of the paved portion of Westlake avenue, and consists of two portions; one part of the platform being between the westerly rail and the curb and the other east of the easterly rail, both portions being about sixty feet long from north to south.

These two portions are connected at each end by a cross-over about five feet in width. The westerly platform next to the paved roadway is constructed of five twelve-inch planks and one eight-inch plank, the eight-inch plank being the one in the back next to the railing, and this platform extends from the curb flush to the steel rail on a level with the top of the rail. The width of this portion of the platform is about five feet, five inches. At the back of it is a railing to separate the platform from the paved roadway of the avenue, which extends from the south end of the platform to within about six feet of the north end, which thus leaves an entrance from the street. Between the paved roadway of the avenue and the westerly rail of the car track there is a depression from twenty-six inches to thirty-two inches deep, measured from the top of the curb, which serves as a gutter or drain for the railway. The westerly platform is built over this depression.

At Halliday street, three hundred fifty-eight feet to the north of Wheeler street, there is another platform like the one just described. Between these two platforms, the track is straight and level and the view unobstructed. The Wheeler street platform is also vis-

ible for at least one thousand feet from the north. This unfortunate accident, by which respondent was seriously maimed and permanently injured, occurred in broad daylight on July 22, 1927, at about 4:45 p. m.

Since the evidence as to how the accident happened is in serious conflict as between respondent and appellant, we are bound as did the jury to accept the version most favorable to respondent.

The allegations of negligence set forth in the complaint are: (a) The street car was being operated at a high, dangerous and unlawful rate of speed and was out of control of the operator; (b) the motorman failed to sound any warning of the approach of the car; (c) the motorman failed and neglected to stop the car or to bring it under control; (d) the motorman failed to keep a proper lookout for persons on the platform; (e) the street car was so constructed and maintained that a portion thereof projected out onto the platform so as to be a menace to and liable to strike persons standing on the platform; (f) the platform was too narrow and did not afford proper space for persons to stand so as to avoid being hit by a passing street car, the platform being too close to the tracks; (g) the motorman, when he saw, or should have seen, the position of respondent, failed to exercise any care or reasonable care to avoid striking respondent, when by the exercise of reasonable care he could have done so; (h) the car was operated without due regard to persons on the platform standing at a place fixed and provided for by appellant.

Appellant denied all the allegations of negligence, and affirmatively alleged that respondent was guilty of want of due care or contributory negligence.

The evidence adduced on behalf of respondent which the jury were justified in resolving in her favor, to-

gether with all reasonable inferences therefrom shows:

Respondent, her father, mother and another woman had been brought from Vancouver, British Columbia, to Seattle on that day by another woman driving her own car. Respondent had never been in Seattle before, and had no familiarity with street cars or street car boarding platforms there. She was sixteen years of age at the time of the accident, and she, her father, her mother and another woman were intending to take the street car down to the city. Respondent and her father, after leaving the automobile in the parking space, walked along Westlake avenue to the curbing, entered the Wheeler street platform at its northerly end, walked to the extreme south end, respondent being just ahead of her father, and stopped at the south end of the platform at a place where respondent was not more than a foot, or a foot and a half, from the extreme south end of the planking. She could not have gone any further without stepping down into the ditch. They both asserted that they stood with their feet on the third plank back from the rail. That would be approximately twenty-four inches from the westerly rail of the south or city-bound track.

They had stood there but a short time when they saw the car approaching from the north which they intended to take, a front entrance car. It was customary to stop such cars at or before reaching the end of such platforms, and near or opposite the passengers. When it was about two hundred feet away, her father raised his hand signaling the car to stop. He was holding a large suit case, and she was holding a smaller one. When the father signaled the street car to stop, they observed that it immediately began to slow down. Respondent watched it while it traveled about fifty feet, apparently coming to a stop. It was

then about one hundred sixty to one hundred seventy-five feet to the north of her. As her father was standing between her and the approaching car, his body hid the full view of the car, and she could not see the extent to which the car would overhang the platform. Having noticed that the car was apparently stopping, respondent looked easterly from which direction her mother and the other lady were approaching, they intending to come across the walk above mentioned in front of the car at the south end of the platform and get on the car. Just then there was a car approaching on the other track going north. As it passed, respondent got sight of the lady coming toward the track with her mother, and then, looking north toward the oncoming car, saw that it was immediately at her. The father jerked quickly back and threw out his hand toward respondent. She had no time to step back and the car went rapidly by her until the full space of the entrance, which was the front entrance, had gone past her. Some dark object sticking out from the side of the car at a point about four feet back of the entrance-way struck her in the throat, hurled her off the platform and into the ditch. The car proceeded some distance before stopping.

The testimony of respondent and her witnesses is positive that no gong was rung by the motorman indicating his intention of passing the platform without stopping, after he had slowed down in response to the father's signal. The testimony is that the car was going approximately twenty-five or thirty miles per hour when it passed respondent. The explanation of the motorman as to the accident was that respondent and her father were not on the platform, but that the father was down in the ditch, south of the platform, and respondent was standing on the paved portion of

the street to the south of the platform, and as the car went by the father, respondent jumped to the curb and leaped or stumbled at the car as it went by. He saw her fall into the ditch and stopped the car in sixty or seventy feet.

From the evidence on behalf of respondent as the case went to the jury, she was an intended passenger standing on the platform provided for such passengers, in plain sight of the motorman, had he been attentive, for a distance of at least one thousand feet. This positive showing obviously made it a question of fact for the jury as to whether or not the motorman, agent of appellant in operating its car, was negligent, and was ample to establish primary negligence.

Although a number of cases are cited by both parties pro and con on this question, we know of no decision of this court or of any other that would absolve any passenger carrier of negligence under such established facts.

Upon this question the present case is stronger than the case of *Harkins v. Seattle Electric Co.*, 53 Wash. 184, 101 Pac. 836, where we approved an instruction to the effect that it was the duty of such passenger carrier for hire, its officers, agents and employees engaged in the operation of such railway and cars to use the highest degree of care, prudence and caution consistent with the practical operation of its road, so as to avoid injuring those who want to board the car and become passengers. To the same effect is *Brott v. Auburn & S. Electric R. Co.*, 220 N. Y. 92, 115 N. E. 273.

The alleged contributory negligence of respondent was also a question of fact for the jury under the circumstances shown in this case. Inasmuch as respondent and her father testified that they were standing at the extreme end of the passenger platform

on the third plank back from the westerly rail, and that a signal had been given to the motorman to stop the car, they had the right to assume that the car would stop before it struck them, or either of them, if either of them was in a position of danger. The car could easily have been stopped by the motorman after the signal had been given before reaching the place where respondent stood, and if she stood at the extreme end of the platform, as she testified, it was absolutely necessary that he should have done so or she could not have entered the car when the door was opened. Moreover, if she were in a position of danger from the overhanging of the car or anything that might project from the side of the car, the motorman, as the operator of the car was presumed to know such things and protect intending passengers from danger. A much higher duty is, of course, due to passengers, or intended passengers, upon public conveyances than is owed to those merely using the streets or highways as crossings.

If respondent was in danger, the motorman's duty began when he saw them in a place of danger of which she might not have been cognizant. *Locke v. Puget Sound International Railway & Power Co.*, 100 Wash. 432, 171 Pac. 242, L. R. A. 1918D 1119. He made no efforts whatsoever to guard them from danger, if he saw their danger, which the jury was warranted in believing he did. On the contrary, according to their evidence, he speeded the car up when they desired to become passengers, and without warning them by a bell or gong.

None of the cases cited from this or other jurisdictions seems to fit this exact situation, but the nearest in our opinion are the *Harkins* case, *supra,* and *Johnson v. Seattle,* 141 Wash. 385, 250 Pac. 409. The last

cited case, together with *Leftridge v. Seattle,* 130 Wash. 541, 228 Pac. 302, are also decisive of the application of the principle of last clear chance, as to which the trial court instructed the jury. See, also, *Zettler v. Seattle,* 153 Wash. 179, 279 Pac. 570.

In the instant case, if respondent was guilty of any want of care at all, this want of care had terminated, leaving her in a position of peril up to the time of the injury.

Errors are also complained of in the giving of certain instructions by the trial court, which have been considered and found not to be erroneous. Most of the instructions given, applied to the facts presented to the jury by respondent and correctly defined the duties of both appellant and respondent under the circumstances. A requested instruction, the refusal of which is alleged as error, we find to have been given in substance by the trial court, so far as applicable to the facts.

Appellant vehemently complains of the permission by the trial court of the calling and examination by counsel for respondent of the motorman of the car which injured respondent as an unwilling and hostile witness. At the trial, counsel for respondent seemed to have relied principally upon the decision of this court and other cases cited in it, in *Repanich v. Columbia & Northern Fishing & Packing Co.,* 135 Wash. 429, 237 Pac. 1012. That case and the cases sustaining and cited in it were based distinctly upon Rem. Comp. Stat., § 1225 and § 1229, providing for examination of adverse parties as witnesses either by interrogatories before trial or by examination at trial, and prescribing that the testimony of the parties so adduced may be rebutted by adverse testimony.

The motorman, although the principal actor in this case and the most important witness to appellant, was

not such a witness. He was not a witness to whom interrogatories for the discovery of evidence before trial might be addressed, nor a principal, vice-principal, or managing agent, who could bind his principal either by admissions or denials. However, the motorman had testified in the former trial. He probably was known to respondent to be a hostile witness, and he was under the control of appellant. Under these circumstances, he could be examined as an adverse witness and his testimony contradicted under the following decisions by this court: *State v. Dalton,* 43 Wash. 278, 86 Pac. 590; *Miller v. Denman,* 49 Wash. 217, 95 Pac. 67, 16 L. R. A. (N. S.) 348; *Hanson v. Columbia & Puget Sound R. Co.,* 75 Wash. 342, 134 Pac. 1058; *Harringer v. Keenan,* 117 Wash. 311, 201 Pac. 306.

We find no reversible error, and the judgment is affirmed.

TOLMAN, PARKER, and MAIN, JJ., concur.